Margaret MCCARTHY, Administratrix of the Estate of Joseph J. McCarthy, Plaintiff,

v.

Daniel SZOSTKIEWICZ and the City of Holyoke, Defendants.

No. Civ.A. 99–30205–MAP.

United States District Court, D. Massachusetts.

Feb. 25, 2002.

Kevin B. Coyle, Coyle, Dunbar, Geoffrion & Ward, Springfield, MA, for Plaintiff.

Lisa Brodeur–McGan, Cooley, Shrair P.C., Springfield, MA, Stephen P. Fitzgibbons, Charles P. Lavelle, Holyoke, MA, for Defendants.

## MEMORANDUM REGARDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### (Docket No. 28)

PONSOR, District Judge.

### I. *INTRODUCTION*

The plaintiff, Margaret McCarthy ("plaintiff"), is the administratrix of the Estate of Joseph McCarthy ("McCarthy"). McCarthy committed suicide in January, 1998, after being denied a promotion to captain in the Holyoke Police Department. Plaintiff alleges that the Mayor of the City of Holyoke at the time, Daniel Szostkiewicz ("Szostkiewicz"), failed to promote McCarthy because McCarthy supported Szostkiewicz's political opponent in the 1995 election.

Plaintiff has sued Szostkiewicz for wrongful death, for intentional infliction of emotional distress, and for tortious inference with contractual relations. In addition, plaintiff has sued Szostkiewicz and the City of Holyoke (the "City") for deprivations of McCarthy's right to engage in political activity under the First and Fourteenth Amendments and the Massachusetts Civil Rights Act (the "MCRA").

For the reasons discussed below, the defendants' motion for summary judgment will be allowed in part and denied in part. Szostkiewicz is not responsible for McCarthy's suicide as a matter of law, and the evidence of record is insufficient as a matter of law to satisfy the elements of a claim for intentional interference with contractual relations. The motion for summary judgment will be allowed as to these counts. However, the record contains sufficient facts to support plaintiff's claims against Szostkiewicz under the federal constitution and the MCRA, and on her claim for intentional infliction of emotional distress. The motion for summary judgment as to these claims therefore will be denied. The motion for summary judgment by the City will be denied as to the § 1983 count, but allowed as the MCRA count because a municipality may not be sued under the MCRA.

### II. *SUMMARY JUDGMENT STANDARD*

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R.Civ.P. 56(c). A "genuine" issue is one that reasonably could be resolved in favor of either party, and a "material" fact is one that affects the outcome of the suit under governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court must view all the evidence in the light most favorable to the nonmoving party, "drawing all reasonable inferences in that party's favor." *Thomas v. Eastman Kodak Co.*, 183 F.3d 38, 42 (1st Cir.1999), *cert. denied,* 528 U.S. 1161, 120 S.Ct. 1174, 145 L.Ed.2d 1082 (2000).

Once the moving party has asserted that no genuine issue of material fact exists, the burden is on the opposing party to point to specific facts demonstrating that there is, indeed, a trialworthy issue. *National Amusements, Inc. v. Town of Dedham,* 43 F.3d 731, 735 (1st Cir.1995). Rule 56(e) requires the opposing party to meet this burden with admissible evidence. "Hearsay evidence, inadmissible at trial, cannot be considered on a motion for summary

judgment." *Garside v. Osco Drug, Inc.,* 895 F.2d 46, 50 (1st Cir.1990). Likewise, "the First Circuit will reject responses by nonmovants that adduce statements not based on personal knowledge or that adduce conjectural or conclusory allegations." *Nicholson v. Promotors on Listings,* 159 F.R.D. 343, 348 (D.Mass.1994).

## III. *FACTUAL AND PROCEDURAL BACKGROUND*

The facts below are viewed in the light most favorable to the plaintiff; all reasonable inferences are drawn in her favor.

McCarthy was a lieutenant in the Holyoke Police Department. (Docket 1). His father was a policeman before him, and McCarthy joined the police force directly out of college. (Docket 31, Exhibit F at 17). Steven Donoghue, Holyoke's Police Chief ("Chief Donoghue"), described McCarthy as "extremely ethical, conscientious, [and] capable," rated McCarthy's police work as "outstanding," and assessed McCarthy's performance as "above reproach." *Id.* at 19.

McCarthy's sister, Margaret McCarthy ("plaintiff" or "Margaret") was also a public servant. Sometime prior to 1995, Margaret was appointed by then-Mayor William Hamilton ("Hamilton") as the Registrar of Voters. (Docket 31, Exhibit E at 9). As a result, McCarthy felt some loyalty towards Hamilton. *Id.* at 8–9.

Hamilton was up for re-election in November of 1995, and his staff asked McCarthy if he would hold a sign for Hamilton on street corners on "visibility days." *Id.* at 8. McCarthy did not immediately agree. Instead, he called a member of the city council, Raymond Feyre ("Feyre"), and asked for his advice. *Id.* at 5–6. McCarthy explained to Feyre that he wanted to hold a sign for Hamilton, but was worried because he was up for a promotion to the rank of captain. *Id.* at 8–9.

According to Feyre, McCarthy explained that he had recently taken the promotional exam, and did not want his involvement in political activity to hinder him, or to be held against him in any way. *Id.* at 9. Feyre advised McCarthy to hold the sign because, in Feyre's opinion, anyone would understand that Hamilton had demonstrated support for McCarthy and his family, and anyone would respect McCarthy's decision to show support for Hamilton in return. *Id.* As it happened, despite McCarthy's support, Hamilton lost the election and Szostkiewicz took office as Mayor. (Docket 31, Exhibit A at 6–7).

Shortly after Szostkiewicz was sworn in, the scores from the promotional exam arrived. McCarthy received a "94"—the highest score. (Docket 31, Exhibit A at 34–35). The next two highest scores were achieved by Lieutenant William McCoy ("McCoy") with an "87", and by Lieutenant Ralph DiNapoli ("DiNapoli") with an "84." *Id.* at 35. There were two open captain's positions.

Sometime in early 1996, Chief Donoghue had a meeting with Szostkiewicz. (Docket 31, Exhibit F at 21). Szostkiewicz asked Chief Donoghue about the scores from the promotional exam, and Chief Donoghue told Szostkiewicz that McCarthy had come in first. *Id.* According to Chief Donoghue, Szostkiewicz shot back, "Screw him. He'll never get a job. He's Hamilton's boy." *Id.* at 22. Chief Donoghue described Szostkiewicz's position in later conversations in the following way: "[Szostkiewicz] was adamant that Joe McCarthy was on the opposing political team and he wasn't to receive consideration." *Id.* at 23.

Feyre had a similar experience. According to Feyre, when he called to recommend McCarthy for the captain position, Szostkiewicz responded, "I hate him." (Docket 31, Exhibit E at 11). Feyre urged

Szostkiewicz not to hold McCarthy's involvement with the Hamilton campaign against McCarthy, but Szostkiewicz did not confirm or deny that this was the reason for his expression of hatred. *Id.* at 12. According to Feyre, Szostkiewicz only said, "I hate him." *Id.*

When it became clear that Szostkiewicz intended to appoint McCoy and DiNapoli to the open positions, Chief Donoghue asked Szostkiewicz to reconsider, based upon the comparative records of McCarthy and DiNapoli. (Docket 31, Exhibit F at 23). Chief Donoghue testified that he told Szostkiewicz that DiNapoli had "had a number of instances that, you know, involve moral turpitude that could be embarrassing to the city, to yourself as the appointing authority." *Id.* at 23. According to Chief Donoghue, Szostkiewicz indicated that he knew about DiNapoli's history, including an incident which resulted in DiNapoli being suspended and having his gun taken away. *Id.* at 24. Chief Donoghue testified further that Szostkiewicz said that he didn't need to examine the record books because "Ralph [DiNapoli] promised me he'd be good." *Id.* Chief Donoghue was appalled by this conversation. *Id.*

On December 5, 1996, Szostkiewicz appointed McCoy and DiNapoli to the rank of captain. (Docket 1 at 2). McCarthy appealed pursuant to Mass.Gen.Laws ch. 31, § 2 to the Massachusetts Civil Service Commission (the "Commission"). The Commission heard the appeal on September 24, 1997. (Docket 29, Exhibit B at 1). The hearing included testimony from, among others, Szostkiewicz and Chief Donoghue. *Id.*

On November 21, 1997, the Commission issued a decision vacating the McCoy and DiNapoli promotions and ordering Szostkiewicz to repeat the selection process. *Id.* at 2. It noted that "three officials of the Holyoke Police Department stated that Szostkiewicz was against [McCarthy] and would not appoint him." *Id.* In particular, it recounted Chief Donoghue's testimony at the hearing that Szostkiewicz would not appoint McCarthy because "he was 'former Mayor Hamilton's boy,'" and the testimony of Captain Alan Fletcher, who testified, according to the Commission's report, that "the Mayor stated that he would never appoint [McCarthy], as he held a sign for the Mayor's opponent in the last mayoral election." *Id.* Accordingly, the Commission found that Szostkiewicz "improperly bypassed [McCarthy] for the position of Police Captain, and that political bias and retribution was the main reason in denying his appointment." *Id.*

Szostkiewicz was undeterred. He did conduct interviews for the second round, but again promoted McCoy and DiNapoli. (Docket 1 at 2). Chief Donoghue testified that Szostkiewicz indicated to him that Szostkiewicz intended all along to re-promote McCoy and DiNapoli. According to Chief Donoghue, Szostkiewicz said, in effect, that "the same people were going to be promoted ... nothing was going to change." (Docket 31, Exhibit F at 39).

McCarthy did not appeal a second time. When Chief Donoghue urged McCarthy to appeal again, because otherwise McCarthy was "not going to see a captaincy probably in [his] lifetime," McCarthy said, "I'm afraid for my sister's job." *Id.* at 97. McCarthy left his conversation with Chief Donoghue apparently undecided, and said, "I don't know what I'm going to do." *Id.* On January 3, 1998, McCarthy took his own life with a firearm. (Docket 1 at 3). A note left to family members read:

> To [sic] much has happened the past 2 years, now this. It's too much. Please don't feel guilty you could have done

nothing to stop this. I love you all and I'm sorry. Please help one another.

(Docket 34, Exhibit 3).

On September 13, 1999, plaintiff filed suit in this court. (Docket 1). The complaint offers seven counts: Count 1 charges Szostkiewicz with violations of McCarthy's rights under the First and Fourteenth Amendments; Count 2 seeks relief under Mass.Gen.Laws ch. 12, § 11I against Szostkiewicz for the deprivation or attempted deprivation of state and federal constitutional rights; Count 3 charges Szostkiewicz with causing the death of McCarthy; Count 4 alleges that Szostkiewicz intentionally inflicted emotional distress upon McCarthy; Count 5 alleges that Szostkiewicz intentionally interfered with McCarthy's contractual relations; and Counts 6 and 7 seek relief from the City, alleging that Szostkiewicz was acting pursuant to a policy or custom of the City to inflict political retribution against those who supported Hamilton in 1995. The defendants now move for summary judgment on all counts. (Docket 28).

## IV. *DISCUSSION*

### A. *Constitutional Claims*

#### 1. *Count 1: Szostkiewicz and the First Amendment*

If Szostkiewicz refused to promote McCarthy on the basis of McCarthy's political activity, this action was an obvious violation of McCarthy's rights under the First and Fourteenth Amendments. The Supreme Court made it clear in *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990), that "promotions ... based on political affiliation or support are an impermissible infringement on the First Amendment rights of public employees." *Id.* at 75, 110 S.Ct. 2729; *see also Padilla–Garcia v. Guillermo Rodriguez*, 212 F.3d 69, 74 (1st Cir.

2000). Szostkiewicz's motion for summary judgment faces an uphill battle in light of this fundamental principle.

■ Szostkiewicz's argument that he is entitled to qualified immunity because McCarthy's right was not "clearly established" under *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), is unsupportable in light of *Rutan.* As noted, *Rutan* could not have been clearer: absent some exceptional circumstance, the First Amendment is offended when a public employee is not promoted because of his political affiliations. 497 U.S. at 75, 110 S.Ct. 2729. *Rutan,* of course, was decided many years before Szostkiewicz allegedly decided not to promote McCarthy because he was "Hamilton's boy."

■ Admittedly, Szostkiewicz might be entitled to qualified immunity if the record contained evidence that the position of police captain was a "policy-making position." *See, e.g., Duriex–Gauthier v. Lopez–Nieves,* 274 F.3d 4, 9 (1st Cir.2001). However, Szostkiewicz has not shown (or even attempted to show) that the position of police captain was a policy-making position or that vital government interests were at stake. Summary judgment cannot be allowed on this basis. *See DiMarco–Zappa v. Cabanillas,* 238 F.3d 25, 35 (1st Cir. 2001) ("Qualified immunity is an affirmative defense, and thus the burden of proof is on defendants-appellants.").

Plaintiff has submitted more than enough evidence for purposes of summary judgment to show that Szostkiewicz failed to promote McCarthy on the basis of McCarthy's political activity. Chief Donoghue's testimony alone would have satisfied this burden. Therefore, Szostkiewicz's request for summary judgment on Count 1 will be denied.

### 2. Count 2: Szostkiewicz and the MCRA

To survive summary judgment on the MCRA claim, plaintiff must show that Szostkiewicz's refusal to promote McCarthy on the basis of his political activity,

> interfer[ed] by threats, intimidation or coercion, or attempt[ed] to interfere by threats, intimidation or coercion, with the exercise or enjoyment [by McCarthy] of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth.

Mass.Gen.Laws ch. 12, § 11H. Szostkiewicz argues that plaintiff has submitted insufficient evidence of the alleged "threats, intimidation, or coercion" that is required by sections 11H and 11I to survive summary judgment.

The precise import of the quoted language is presently unsettled. As Chief Judge Young noted recently, the Supreme Judicial Court's interpretation of the "threats, intimidation, or coercion" element of the statute has "created quite a bit of confusion in this district." *Carvalho v. Town of Westport,* 140 F.Supp.2d 95, 101 (D.Mass.2001). Normally, the Supreme Judicial Court has required a "showing of an 'actual or potential physical confrontation accompanied by a threat of harm'...." *Id.,* quoting *Planned Parenthood League of Mass., Inc. v. Blake,* 417 Mass. 467, 474 n. 8, 631 N.E.2d 985. However, in some cases it has suggested that "threatening a breach of contract" is sufficient, 140 F.Supp.2d. at 101, citing *Redgrave v. Boston Symphony Orchestra, Inc.,* 399 Mass. 93, 95, 502 N.E.2d 1375 (1987), although Chief Judge Young has pointed out that this interpretation has recently been under fire. *See Buster v. George W. Moore, Inc.,* No. 97–637–F, 2000 WL 576363 (Mass.Super. April 28, 2000).

■ This case presents an issue that falls on the fringe of this dispute. As Chief Judge Young has noted, the Supreme Judicial Court has not yet foreclosed a cause of action under Mass.Gen.Laws ch. 12, § 11I for "threats, intimidation, or coercion" in connection with the loss of a contractual right. *Carvalho,* 140 F.Supp.2d at 102. Plaintiff has introduced sufficient evidence to survive summary judgment on that theory for the following reasons.

First, there is at least a genuine issue of material fact about whether McCarthy had a contractual right to be considered for the promotion without reference to his past political activity. The Commission's decision vacating the first round of promotions noted that Mass.Gen.Laws. ch. 31, § 2(b) gives public employees the right to be considered for promotions free from political bias. (Docket 29, Exhibit B). Whether this constitutes a "contractual right" is a question for trial.

Second, there is a material issue of fact about whether McCarthy suffered "threats, intimidation, or coercion" with regard to his right to be considered for the promotion free from political consideration. As the Supreme Court has noted, there is something inherently coercive about suffering adverse consequences because of political affiliations.

> Employees who find themselves in dead-end positions due to their political backgrounds are adversely affected. They will feel a significant obligation to support political positions held by their superiors, and to refrain from acting on the political views they actually hold, in order to progress up the career ladder.

*Rutan,* 497 U.S. at 73, 110 S.Ct. 2729. The Court noted further that promotion denials may be "enough of an imposition to pressure employees to affiliate with the

favored party." *Id.* at 73 n. 6, 110 S.Ct. 2729. Given this authority, the record is sufficient to show that McCarthy was a victim of a coercive violation of his constitutional rights. Therefore, the motion for summary judgment as to Count 2 will be denied.

### 3. *The City*

In Counts 6 and 7, plaintiff offers the theory that the actions discussed above, and charged in Counts 1 and 2, were undertaken pursuant to "a custom or policy" of the City. The City argues that these counts cannot stand because under *Monell v. New York Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), municipalities cannot be held liable on the theory of *respondeat superior.*

The City's argument misunderstands the nature of plaintiff's claims. In *Monell,* the Supreme Court did hold that "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." 436 U.S. at 691, 98 S.Ct. 2018. However, the Court also made it clear that "it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Id.* at 694, 98 S.Ct. 2018. Plaintiff clearly charges the City under the latter theory.

Plaintiff argues that because Szostkiewicz was the final authority and sole decision-maker about who would be promoted to captain in the Holyoke Police Department, his actions "relating to police promotions were *per se* the custom or policy of the City." (Docket 34 at 7). Municipal liability under § 1983 may attach where "a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati,* 475 U.S. 469, 483, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986).

Plaintiff has introduced sufficient evidence for purposes of summary judgment to show that (1) Szostkiewicz made such a deliberate choice; and (2) he was responsible for establishing final policy with respect to promoting captains. First, Chief Donoghue testified that Szostkiewicz's "bases for selections were always political." (Docket 31, Exhibit F at 47). This, along with other evidence submitted by plaintiff, satisfies the first prong. Second, Szostkiewicz agreed in his deposition that he was "the sole appointing authority for appointments and promotions to the Holyoke Police Department." (Docket 31, Exhibit A at 10). This testimony is sufficient evidence to show that Szostkiewicz was responsible for establishing the City's final policy with respect to promoting captains. Thus, Szostkiewicz's actions may subject the City to liability under § 1983. *See Powell v. City of Pittsfield,* 143 F.Supp.2d 94, 125 (D.Mass.2001) (denying city's summary judgment motion when "ultimate decision" about whether plaintiff would be reinstated on police force belonged to mayor). Therefore, the City's motion to dismiss Count 6 will be denied.

A different result is mandated for Count 7. It is now clear that "under Massachusetts law, a municipality cannot be sued under the MCRA." *Kelley v. LaForce,* , 279 F.3d 129, 139 n. 8 (1st Cir. 2002). *See also LeBeau v. Town of Spencer,* 167 F.Supp.2d 449, 455 (D.Mass.2001) (same); *Metivier v. Town of Grafton,* 148 F.Supp.2d 98, 102 (D.Mass.2001) (same). The Appeals Court of Massachusetts recently concluded that "a municipality is not a 'person' covered by the Massachusetts Civil Rights Act . . . ." *Howcroft v. City of*

*Peabody,* 51 Mass.App.Ct. 573, 591–592, 747 N.E.2d 729 (2001). It explained that "there is no indication in the MCRA that the word 'person' includes either the Commonwealth or any of its political subdivisions." *Id.* at 592, 747 N.E.2d 729. In fact, Mass.Gen.Laws ch. 4, § 7 defines "person" only to include "corporations, societies, associations and partnerships." *Id.* Therefore, plaintiff's MCRA claim against the City is misplaced. The motion for summary judgment as to Count 7 will be allowed.

## B. *Wrongful Death*

■ Szostkiewicz argues that under Massachusetts law, a defendant may be held responsible for another's suicide only when (1) as a consequence of a physical impact, death results from an uncontrollable impulse or is accomplished in a delirium or frenzy; *or* (2) the defendant had a duty to prevent the suicide from occurring. *See Slaven v. City of Salem,* 386 Mass. 885, 886–887, 438 N.E.2d 348 (1982) (discussing two possibilities). Plaintiff does not dispute this interpretation of the law, and does not argue that either circumstance applies. Therefore, summary judgment will be allowed for Count 3.

## C. *Intentional Infliction of Emotional Distress*

■ Plaintiff has offered sufficient evidence to reach the jury on the intentional infliction of emotional distress claim. To prevail on a claim of intentional infliction of emotional distress, a plaintiff must show:

(1) that the defendant intended to inflict emotional distress, or knew or should have known that emotional distress was the likely result of his conduct, but also (2) that the defendant's conduct was extreme and outrageous, beyond all possible bounds of decency and utterly intol-

erable in a civilized community, (3) the actions of the defendant were the cause of the plaintiff's distress, and (4) the emotional distress suffered by the plaintiff was severe and of such a nature that no reasonable person could be expected to endure it.

*Tetrault v. Mahoney, Hawkes & Goldings,* 425 Mass. 456, 466, 681 N.E.2d 1189 (1997), *citing Payton v. Abbott Labs,* 386 Mass. 540, 555, 437 N.E.2d 171 (1982), *citing Agis v. Howard Johnson Co.,* 371 Mass. 140, 145, 355 N.E.2d 315 (1976). The submissions by plaintiff create a triable issue on these elements.

In the oft-cited case of *Agis,* which is also relied on by Szostkiewicz, the Supreme Judicial Court found that an allegation that a restaurant manager had fired waitresses systematically, in an attempt to uncover a suspected thief, was sufficient to sustain a claim for the intentional infliction of emotional distress. *Id.* The Supreme Judicial Court explained that "[f]rom their own experience jurors are aware of the extent and character of the disagreeable emotions that may result from the defendant's conduct." *Id.* at 144, 355 N.E.2d 315.

This case falls easily within the *Agis* framework. Feyre has testified that Szostkiewicz said about McCarthy, "I hate him," and according to Chief Donoghue, Szostkiewicz said, "Screw him. He'll never get a job." Further, while Szostkiewicz cannot be held liable on a wrongful death theory for McCarthy's suicide, the fact of the suicide is certainly evidence of the distress that McCarthy felt. Indeed, the suicide note read, "To [sic] much has happened the past 2 years, now this. It's too much." (Docket 34, Exhibit 3). The jury may decide, from its own experience, whether these facts, along with the other evidence plaintiff has assembled, are sufficient to meet the requirements outlined

above. Thus, the motion for summary judgment as to Count 4 will be denied.

### D. *Tortious Interference*

 "In Massachusetts, in order to prove an action for intentional interference with advantageous contractual relations the plaintiff must show that he had a contract with a third party, the defendant knowingly induced the third party to break the contract, and the plaintiff was harmed by the defendant's actions." *Devlin v. WSI Corp.*, 833 F.Supp. 69, 78 (D.Mass. 1993). This claim must fail against Szostkiewicz because there is no relevant "third-party." "[B]y definition, tortious interference with a contract cannot be alleged against a party to the contract." *Id.*

Although it is true as a technical matter that McCarthy's contract was with the City rather than its mayor, to allow the claim to go forward on that basis would elevate form over substance. As the preceding discussion has shown, the mayor was "the sole appointing authority for appointments and promotions to the Holyoke Police Department." Thus, the contract (if any) that was allegedly broken was, functionally speaking, between McCarthy and Szostkiewicz. *Cf. Fioriglio v. City of Atlantic City*, 996 F.Supp. 379, 392 (D.N.J.1998), *affirmed*, 185 F.3d 861 (3d. Cir.1999), *cert. denied*, 528 U.S. 1075, 120 S.Ct. 789, 145 L.Ed.2d 666 (2000) (noting that under New Jersey law, "city employees cannot be found liable for tortious interference with a co-employee's contractual advantage" and "while the corporate entity may be the technical party to the employment contract, the corporation can act only through its agents and employees."), *citing Printing Mart–Morristown v. Sharp Electronics Corp.*, 116 N.J. 739, 761, 563 A.2d 31 (1989). Szostkiewicz is not a "third-party" for purposes of a tortious interference

claim. Therefore, the motion for summary judgment as to Count 5 will be allowed.

### V. *CONCLUSION*

For the reasons set forth above, the defendants' motion for summary judgment is hereby ALLOWED as to Counts 3, 5, and 7, and DENIED as to Counts 1, 2, 4, and 6.

A separate order will issue.

### *ORDER*

For the reasons stated in the accompanying Memorandum, the defendants' motion for summary judgment is hereby ALLOWED as to Counts 3, 5, and 7, and DENIED as to Counts 1, 2, 4, and 6. The clerk will set a date for a status conference to set a schedule for future proceedings.

It is So Ordered.