**NORTH SHORE PHARMACY SERVICES, INC., et al., Plaintiffs,**

v.

**BRESLIN ASSOCIATES CONSULTING LLC, Defendant.**

**Civil Action No. 02–11760–NG.**

United States District Court, D. Massachusetts.

May 15, 2007.

Martin E. Levin, Stern, Shapiro, Weissberg & Garin, Boston, MA, John E. Schreiber, James M. Smith, Dewey Ballantine, LLP, New York, NY, for Plaintiffs.

Orlee Goldfeld, Arthur Rene Hollyer, Butzel Long PC, New York, NY, Patrick J. Markey, O'Shea, Getz & Kosakowski, P.C., Springfield, MA, for Defendant.

## ORDER

GERTNER, District Judge.

Order entered denying 107 Motion for Summary Judgment; adopting Report and Recommendations re 133 Omnicare Parties' Motion for Summary Judgment: After careful review of Omnicare's objections to Magistrate Judge Dein's Report, I nev-

ertheless adopt the Report and its conclusions. As Magistrate Dein's Report suggests, this case is replete with material, contested issues of fact, regardless of the legal issue for which Omnicare seeks certification. Likewise, I agree with the Report that there is no basis for such certification on this record.

## REPORT AND RECOMMENDATION ON THE OMNICARE PARTIES' MOTION FOR SUMMARY JUDGMENT

DEIN, United States Magistrate Judge.

### I. INTRODUCTION

Plaintiffs North Shore Pharmacy Services, Inc. ("North Shore") and Value Pharmacy, Inc. ("Value") are institutional pharmacies that are wholly-owned subsidiaries of Omnicare, Inc. ("Omnicare"). In 2002, North Shore and Value initiated this action against Breslin Associates Consulting LLC ("BAC"), claiming that BAC had committed various torts in connection with an audit of their pricing and billing practices which BAC had performed for an association of long term care facilities. BAC asserted counterclaims alleging that the pharmacies were liable to it for certain tortious conduct in connection with the audit, and that the lawsuit against BAC had been brought for illegitimate purposes and constituted an abuse of process. BAC also added Omnicare as an additional counterclaim defendant.

On June 4, 2003, Curtis Breslin, the chief executive officer and principal employee of BAC, committed suicide. Thereafter, the counterclaims were supplemented to name as counterclaim plaintiffs Mr. Breslin and his spouse, Linda Breslin, individually, as executrix of her husband's estate and as guardian of the Breslins' minor daughter, Carly Breslin. The individual counterclaim plaintiffs also asserted claims against North Shore, Value and Omnicare (collectively, the "Omnicare Parties") that were premised upon the theory that the counterclaim defendants' allegedly tortious conduct substantially contributed to Mr. Breslin's suicide and the resulting harm to his family.

Presently before the court is the Omnicare Parties' Motion for Summary Judgment (Docket No. 107) by which the Omnicare Parties are seeking summary judgment on all of the counterclaims asserted against them.[1] The Omnicare Parties have also requested that in the event their motion is denied, the court certify to the Massachusetts Supreme Judicial Court ("SJC") the question whether a claim for wrongful death by suicide is recognized under Massachusetts law and, if so, the elements necessary to prove such a claim.

For the reasons detailed below, this court finds that there are genuine issues of material fact precluding summary judgment for the Omnicare Parties on any of the counterclaims. Therefore, this court recommends to the District Judge to whom this case is assigned that the Omnicare Parties' Motion for Summary Judgment (Docket No. 107) be DENIED. Moreover, since the factual record needs to be developed at trial, and the same evidence would be relevant regardless whether the claim for wrongful death by suicide remains in the case, this court recommends that the District Judge deny the Omnicare Parties' request for certification to the SJC.

1. BAC's counterclaims are set forth in its Answer and Counterclaims (Docket No. 6), and the individuals' counterclaims are set forth in the Supplement to Counterclaims, which is ed as Exhibit A to the Declaration of James P. Smith III (Docket No. 110).

## II. STATEMENT OF FACTS[2]

The facts, viewed in the light most favorable to the counterclaim plaintiffs, are as follows:

### The Parties

Omnicare is a corporation that is organized under the laws of Delaware and has a principal place of business in Covington, Kentucky. (Omnicare Ex. B ¶ 2). Omnicare is engaged, *inter alia*, in the institutional pharmacy business, and provides pharmaceutical supplies and services to nursing homes and other long term care facilities. (OF ¶ 1). Primarily through its wholly-owned subsidiaries, Omnicare serves over 746,000 residents in long-term care facilities in 45 states, making it the nation's largest provider of professional pharmacy services. (BF ¶ 1). North Shore and Value are Massachusetts-based institutional pharmacies and are wholly-owned subsidiaries of Omnicare. (OF ¶ 2).

BAC was a limited liability sole proprietorship that was organized under the laws of Connecticut and was run by Curtis S. Breslin from Mr. Breslin's home in Branford, Connecticut. (OF ¶ 3; BF ¶ 3). BAC was a health care consulting firm, and Mr. Breslin served as BAC's chief executive officer and principal employee up until June 4, 2003, when he committed suicide. (BF ¶ 3; OF ¶ 4). Mr. Breslin was neither a trained pharmacist nor a certified public accountant. (OF ¶ 4). Nevertheless, he held a Masters Degree in Public Health (Hospital and Health Service Administration) from Yale University, had been involved in the health care field in Connecticut for more than 20 years, had supervised the health care group in an accounting firm and had several major health care projects to his credit, including projects for the State of Connecticut, which Mr. Breslin had completed at the request of at least three different Governors. (BF ¶ 4). Mr. Breslin also had a reputation as an honest, responsible and competent consultant in the field of health care administration, which constituted a valuable asset to BAC's and Mr. Breslin's business. (*Id.*). Furthermore, due to his contacts in the health care field, Mr. Breslin was able to consult with knowledgeable pharmacists as needed. (*Id.*).

Linda Breslin had been Curtis Breslin's wife for more than ten years at the time of Mr. Breslin's death. (OF ¶ 5; BF ¶ 5). She is the guardian of their minor daughter, Carly Breslin, and is the executrix of Mr. Breslin's estate. (OF ¶ 5). BAC and the individual counterclaim plaintiffs shall be referred to collectively as "Breslin."

### The CALTC Audit

The parties first encountered each other in connection with an audit that BAC performed for the Connecticut Alliance for Long Term Care ("CALTC"). CALTC is an association of 12 organizations that control approximately 30 nursing homes and other long-term care facilities located in Connecticut. (OF ¶ 6; BF ¶ 6). Michael O'Brien, the President and Chief Execu-

---

**2.** The facts are derived from the following materials: (1) The Omnicare Parties' Local Rule 56.1 Statement of Material Facts as to Which There is No Genuine Issue to be Tried (Docket No. 108) ("OF"); (2) Exhibits attached to the Declaration of James P. Smith III in Support of the Omnicare Parties' Motion for Summary Judgment (Docket No. 110) ("Omnicare Ex. ——"); (3) Exhibits attached to the Reply Declaration of James P. Smith III in Further Support of the Omnicare Parties' Motion for Summary Judgment (Docket No. 129) ("Omnicare Reply Ex. ——"); (4) The Breslins' Local Rule 56.1 Statement of Material Facts of Record as to Which it is Contended There is a Genuine Issue to be Tried (Docket No. 119) ("BF"); and (5) Exhibits accompanying the Declaration by A. Rene Hollyer in Opposition to Omnicare's Motion for Summary Judgment (Docket No. 122) ("Breslin Ex. ——").

tive Officer of CALTC, had known Mr. Breslin for more than 12 years. (BF ¶ 6). According to Mr. O'Brien, in 2000 personnel at several of CALTC's member facilities expressed concern regarding "the accuracy of their invoices and pricing that they were getting on their pharmaceuticals" and "whether they were being billed in accordance [with] the terms of the contract and the negotiated fees for the medications" and other services. (Breslin Ex. 8 at 17). Consequently, in 2001, Mr. O'Brien hired BAC to perform an audit of institutional pharmacy billings to certain of CALTC's member facilities. (BF ¶ 6). Omnicare's wholly-owned subsidiary in Connecticut was the entity that supplied the pharmaceuticals and services that were the subject of the audit. (*Id.*).

BAC's audit procedure involved calculating, pursuant to CALTC's contract with Omnicare's subsidiary, the prices of the thousands of pharmaceuticals delivered within a one month period, and comparing those calculations with the prices actually charged by the supplier on its invoices for that period to insure that CALTC was not being overcharged. (*Id.*). This was the first time such an audit process had been conducted at CALTC. (*Id.*).

In June 2001, BAC issued an audit report to CALTC. (OF ¶ 7). Therein, BAC set forth what it had concluded were overcharges by Omnicare's Connecticut affiliate. (OF ¶ 7; BF ¶ 7). Omnicare disputed both the methodology and results of BAC's audit. (OF ¶ 8). Nevertheless, Omnicare admitted to certain billing errors, and repeatedly declined to explain to CALTC why BAC's work was inaccurate, despite being given opportunities to do so. (BF ¶¶ 7–8; Breslin Ex. 8 at 35, 44–45).

Omnicare did not react favorably to Mr. Breslin and his company. During a meeting between Mr. Breslin, CALTC personnel and Omnicare representatives regarding BAC's audit, Jeffrey Stamps, Omnicare's Regional Vice President for the Eastern Region, became agitated and requested a "time out" in order to meet with Mr. O'Brien alone. (BF ¶¶ 2; 9A; Breslin Ex. 8 at 41). Mr. O'Brien described his meeting with Mr. Stamps as follows:

> Mr. Stamps was very agitated, very angry, was very angry and hostile towards Mr. Breslin. He felt that his professional integrity had been challenged by this analysis, that Omnicare as an organization had been challenged, their integrity had been challenged. He did not agree with the methodology and the findings of this study. At the same time, he wanted to reach some type of agreement or settlement, because the value of the business of CALTC was very important to Omnicare of Connecticut and Omnicare nationally. But, quite frankly, he was very angry towards Curt Breslin.

(BF ¶ 9A; Breslin Ex. 8 at 41–42).

Omnicare also accused Mr. Breslin of misappropriating its trade secrets in connection with the CALTC audit, and threatened to sue him. However, no such lawsuit was ever brought. (BF ¶ 9C & n. 5; Breslin Ex. 44). Nevertheless, Mr. Stamps continued to express anger at Mr. Breslin and the results of BAC's audit in e-mails to colleagues at Omnicare. For example, on January 7, 2002, Mr. Stamps stated in an e-mail relating to the CALTC audit that "THIS IS VERY GOOD NEWS ... AND WILL MAKE [CURT BRESLIN] LOOK LIKE THE OPPORTUNIST THAT HE IS. This really strengthens our lawsuit against Breslin ... They are really playing into our hands." (BF ¶ 9B; Breslin Ex. 43 at 1). Additionally, in an e-mail dated March 5, 2002, Mr. Stamps stated in reference to Omnicare's effort to settle the CALTC matter, that "[t]his whole thing

sickens me." (BF ¶9B; Breslin Ex. 43 at 3).

Despite its objections to BAC's report, in April 2002, Omnicare reached an agreement with CALTC regarding the issues raised by BAC's audit,

[REDACTED]

[REDACTED]

(Breslin Ex. 42 at 1). Mr. O'Brien commented on BAC's work as follows:

> I am very pleased with the outcome of this difficult project and the quality of the work performed by Breslin Associates. The outcome has reinforced the value of [CALTC]. We have learned a great deal about the Pharmacy business and how we can better control our financial risk and demand improved quality of services from our Pharmacy providers.

(*Id.*).

Despite CALTC's satisfaction with BAC's services, Omnicare made it impossible for CALTC to retain BAC for future auditing work. (BF ¶9D). Thus, when CALTC entered into a new contract with Omnicare, as part of which Omnicare agreed to pay for an annual audit of its pricing, Omnicare specifically refused to allow BAC to perform the auditing work, notwithstanding CALTC's request that BAC do so. (*Id.*).

### The Aurum Audit

Subsequent to the CALTC audit, BAC was retained to perform a similar audit for the Aurum Network of Gloucester, Massachusetts ("Aurum"). (OF ¶10). North Shore and Value initiated the present litigation against BAC following BAC's presentation of its initial findings from the Aurum audit.

Aurum is an association of nursing homes that owns and operates approximately 17 to 20 facilities in Massachusetts. (OF ¶10; BF ¶10). Aurum's Chief Executive Officer, Kathryn Melendy, contacted BAC based on Mr. O'Brien's recommendation, and in early 2002, she executed an agreement with BAC pursuant to which BAC agreed to conduct an audit of 14 Aurum facilities. (BF ¶10). Omnicare's subsidiaries, North Shore and Value, provided pharmaceutical services and supplies to 10 of those facilities pursuant to a Pharmacy Services Agreement with Aurum. (OF ¶10; BF ¶10). Pharmerica, Inc., another large institutional pharmacy, provided supplies and services to the remaining 4 facilities. (BF ¶10).

Like the CALTC audit, the Aurum audit was intended to insure that the prices the providers charged to the Aurum facilities were appropriate under the providers' contracts with Aurum. (*Id.*). Accordingly, BAC proposed to conduct an initial sample study consisting of approximately 7,500 to 8,600 transactions, and to employ a methodology to this initial study that would include, *inter alia*, a one month comparison of invoiced charges of drugs against the terms of the Omnicare Contract and Pharmerica Contracts. (Omnicare Ex. J at 1–2). BAC further proposed that "[i]f it is determined that there are inconsistencies between invoiced charges and the terms of the Omnicare Contract, [and] Pharmerica [contract,] future studies may include a retrospective audit for all charges made over the term of the contract as well as quarterly audits of utilization, charges and pricing consistency." (*Id.* at 2).

In May 2002, BAC completed a report of its initial findings from the audit of the 14 facilities. (OF ¶13; BF ¶13). As Mr. Breslin stated in a cover letter to Aurum dated June 25, 2002, BAC had determined that there was *"ample evidence to suggest that there may have been significant overcharges above and beyond your negotiated contract price for both Pharmacy Vendors."* (Omnicare Ex. L. at 1) (emphasis

in original). BAC determined that, in addition to Pharmerica overcharges, there had been a total of $14,932.60 in overcharges by North Shore and Value in March 2001, the month that had been selected for auditing purposes, and that this would translate into overcharges of $671,967 over the 45 month term of Aurum's contract with Omnicare. (OF ¶ 14; Omnicare Ex. M at 4).

Pharmerica met with Mr. Breslin and, after review and negotiation, ultimately agreed to give Aurum a credit of approximately $145,000.00 (BF ¶ 30a & n. 13). In sharp contrast, North Shore and Value refused to meet with BAC, and, in the Breslin Parties' view, began a campaign to destroy BAC and Mr. Breslin personally and professionally.

Mr. Breslin presented the results of the initial audit report and a copy of his June 25 letter at a meeting on June 26, 2002 with Ms. Melendy of Aurum and representatives from the Omnicare Parties. (BF ¶ 13). Mr. Breslin informed the meeting participants that the numbers were not written in stone and that BAC was seeking feedback from the Omnicare Parties. (BF ¶¶ 13, 14; Breslin Ex. 10 at 26). As Ms. Melendy described the situation, Mr. Breslin "wanted [Aurum] to initially give to each of the pharmacies the numbers in the books, have the pharmacies take a look at them. If there were any areas that they were specifically concerned about, he wanted to have them identified, brought back, so that we could work out any of the areas that there was not agreement on." (Breslin Ex. 7 at 23). In other words, according to Ms. Melendy, "[Mr. Breslin] said that this would be a process, that there are areas that because of the billing he was unsure whether each one of the numbers would be totally accurate and he

needed the pharmacies to take a look at it." (*Id.* at 24). Mr. Breslin did not say anything derogatory about the pharmacies in his presentation of the audit results, which Ms. Melendy considered thorough and professional. (*Id.*).

The Omnicare Parties contend that they disputed the methodology and results of BAC's audit, that the issues that arose from the Aurum audit were the same as the issues that Omnicare had identified in connection with the CALTC audit, and that BAC later acknowledged certain errors in its audit. (OF ¶¶ 15–17). Breslin has presented evidence disputing these contentions, as well as expert testimony supporting the methodology employed by BAC. (*See* BF ¶¶ 15–17 & exhibits cited; Breslin Exs. 25 & 26).

In any event, it is undisputed that following the June 26, 2002 meeting, the Omnicare Parties refused to communicate or meet with Mr. Breslin to address issues raised by the audit, even though Ms. Melendy asked them to do so. (BF ¶¶ 15–16; Breslin Ex. 5, Response # 16; Breslin Ex. 7 at 42–43). Mr. Lozier, North Shore's Chief Operating Officer, acting under the direction of his superior, Mr. Stamps, called Ms. Melendy and informed her that the Omnicare Parties did not intend to deal with Mr. Breslin and would not meet with him.[3] (BF ¶¶ 2, 28–29; Breslin Ex. 10 at 47–48, 52). Therefore, whether or not BAC's initial findings were flawed, a question that is vigorously disputed in this case, the Omnicare Parties were unwilling to engage in the process contemplated by BAC as part of the audit for resolving areas of disagreement.

On or about July 8, 2002, BAC presented Aurum with a revised audit report, which Ms. Melendy provided to the Omni-

---

**3.** BAC's defamation claim is based on statements that Mr. Lozier made to Ms. Melendy during this call. The specific statements at issue are detailed below.

care Parties.[4] (OF ¶ 18; BF ¶ 18). In his cover letter accompanying the revised report, Mr. Breslin stated in relevant part:

> As previously discussed in memoranda, cover letters and in meetings with your Pharmacy Committee, Albert Sivo and David Lozier of Omnicare, this process is not intended as adversarial but rather one of give and take.
>
> We have identified to the best of our knowledge charges and interpretations of the invoices, which require further clarification.
>
> For this process to work, it is incumbent that the representative of Omnicare review our findings, highlight and identify those charges or conclusions made by us in interpreting their Master Contract, which they find contrary, and for us to engage in a discussion that will result in a tangible resolution.
>
> Our ultimate goal is to forge a partnership between the members of the Aurum Network and their Pharmacy Provider which will provide easier access and data downloads of pharmacy utilization data which can then be used for future Benchmarking and improved Clinical Information Systems. Hopefully we will be able to forge that partnership.

(Breslin Ex. 37 at 6). Nevertheless, the Omnicare Parties still refused to communicate or meet with Mr. Breslin, making it impossible for BAC to complete the audit. (*See* BF ¶ 15; Breslin Ex. 10 at 52).

The Omnicare Parties' refusal to deal with Mr. Breslin did not alter Ms. Melendy's opinion that Mr. Breslin was a good consultant. (Omnicare Ex. H at 60). However, due to the Omnicare Parties' position, Aurum was not able to maintain an ongoing relationship with BAC or to use it for future audit work as Aurum had anticipated. (*Id.*).

BAC lost approximately $900,000 of continued work from Aurum and CALTC, and Mr. Breslin suffered, at a minimum, severe financial harm. (*See* BF ¶ 47C). Thus, BAC's income went from approximately $200,000 in 2002 to less than $11,000 in 2003, all of which was for non-pharmacy consulting work. (*Id.*). The stress on Mr. Breslin was compounded by the costs incurred in defending the lawsuit brought by Northshore and Value. (BF ¶¶ 47C, 47D1; Breslin Ex. 20 at 97–98).

### The Instant Litigation

On July 26, 2002, North Shore and Value filed the instant lawsuit against BAC in Massachusetts state court. (OF ¶ 20). The action was later removed to this court. (*Id.* at n. 7). By their complaint, North Shore and Value asserted claims against BAC arising out of BAC's delivery of its audit reports to Aurum, including claims for defamation, tortious interference with a business relationship and/or prospective contractual relationship, injurious falsehood, unjust enrichment, and violation of Mass. Gen. Laws ch. 93A ("Chapter 93A"). (Omnicare Ex. P). They also are seeking injunctive relief "prohibiting [BAC] from publishing false and defamatory statements regarding the [plaintiffs] to persons who do business with the [plaintiffs]" including "without limitation, statements that the [plaintiffs] have overcharged Aurum with respect to the costs of pharmaceutical services and supplies, and or otherwise breached the [Pharmacy Services] Agreement." (*Id.* at Introduction & Prayers for Relief). Breslin contends that the pharmacies' true motivation for filing the lawsuit was to harm Mr. Breslin and put BAC out of the pharmacy auditing business. (*See* BF ¶¶ 22; 30–31).

---

**4.** In this revised report, BAC took into account at least some of the Omnicare Parties' objections to establishing pricing as had been raised in the CALTC audit. (*See* BF ¶ 17).

Mr. Stamps was one of the individuals at Omnicare who decided to initiate the lawsuit. (BF ¶ 20c; Breslin Ex. 9 at 121, 128). He has admitted that he did not read BAC's revised audit report before making this decision. (BF ¶ 20c; Breslin Ex. 9 at 128). He also did not consult with Omnicare's Massachusetts subsidiaries or with any outside pharmaceutical pricing expert before bringing suit. (BF ¶¶ 20d, 20e).

On September 20, 2002, BAC answered the complaint and asserted counterclaims against North Shore and Value arising out of statements that were made to Aurum and actions that the pharmacies took as a result of BAC's audit, including the decision to initiate a legal action. (Omnicare Ex. D). Specifically, BAC asserted claims for defamation, tortious interference with its current and prospective contractual and business relationship with Aurum, injurious falsehood, abuse of process and violation of Chapter 93A. (*Id.*). BAC also added Omnicare as an additional counterclaim defendant. (Omnicare Ex. Q).

Mr. Breslin committed suicide on June 4, 2003. (OF ¶ 26). Subsequently, BAC's claims against the Omnicare Parties were supplemented to add as counterclaim plaintiffs Mr. Breslin and Linda Breslin, individually, as executrix of her husband's estate and as guardian of her minor daughter, Carly Breslin. (Omnicare Ex. A). The individual counterclaim plaintiffs also asserted counterclaims against the Omnicare Parties for wrongful death by suicide, intentional infliction of emotional distress and violations of Chapter 93A, all of which were based on the theory that the Omnicare Parties' allegedly tortious conduct substantially contributed to Mr. Breslin's suicide and caused his family to experience severe emotional distress. (Omnicare Ex. A).

### *Mr. Breslin's Medical History*

Omnicare contends that Mr. Breslin's suicide was caused by a history of mental illness and Mr. Breslin's decision to stop taking medication and to remain in therapy, while Breslin asserts that the actions of the Omnicare Parties triggered Mr. Breslin's decision to take his own life. The record is insufficient to make this determination as a matter of law, and its resolution should be left to the jury.

The evidence shows that Mr. Breslin suffered from bipolar disorder, also known as manic depression. (OF ¶ 34). There is no cure for bipolar disorder, but patients suffering from the illness can experience various stages of remission, including total remission. (BF ¶ 34).

In 1975, 28 years before his death, Mr. Breslin was hospitalized for a number of days and was diagnosed with "cyclothymic personality," which is also known as a manic episode. (OF ¶ 37). This was Mr. Breslin's only psychiatric hospitalization and it occurred following the unexpected death of his father from cancer, when Mr. Breslin was a student at Colgate University. (BF ¶ 37; Omnicare Ex. BB). At the time of his hospitalization, Mr. Breslin's mother expressed concern about the possibility that her son would commit suicide, but Mr. Breslin's doctor assured her that there was no such risk, and there is no record of any suicide attempts or threats in Mr. Breslin's medical history. (OF ¶ 37; BF ¶ 37).

Mr. Breslin was prescribed lithium carbonate upon his discharge from the hospital. (Omnicare Ex. BB). Also at about that time, Mr. Breslin was in the care of Dr. Vandersall, a psychiatrist. (OF ¶ 38; BF ¶ 38). Notwithstanding his medical condition, Mr. Breslin was able to complete his education at Colgate and to go on to obtain a Masters degree from Yale University. (BF ¶ 37).

Sometime in 1983, Mr. Breslin left his job with a Connecticut accounting firm to begin employment with a consulting firm in suburban New York. (OF ¶ 39). The new job was very stressful and Mr. Breslin became depressed and then manic. (Omnicare Ex. DD at 72–73, 77–78, 101–02). Consequently, Mr. Breslin began seeing Dr. Alan Sholomskas, a psychiatrist. (BF ¶¶ 39–42). At that time, Dr. Sholomskas confirmed the diagnosis of manic depression and recommended that Mr. Breslin go back on lithium. (Omnicare Ex. Z at 42–45). Mr. Breslin continued to see Dr. Sholomskas, at least on an occasional basis, until about September 1993, when Dr. Sholomskas reconfigured his practice and dropped some of his patients, including Mr. Breslin. (BF ¶¶ 39–42).

In early 1985, Mr. Breslin's then wife, Randy Griffin, urged him to seek further treatment from Dr. Sholomskas. (OF ¶ 41). Dr. Sholomskas' notes from that time period suggest that Mr. Breslin had stopped taking lithium and that he was experiencing decreased sleep, pressure, irritability and rage. (Omnicare Ex. Z at 62, 66). Mr. Breslin agreed to restart treatment with lithium. (*Id.* at 62).

According to Breslin's expert witness, Dr. David Lowenthal, Mr. Breslin's mood was stabilized in 1985 and "there is no evidence that Mr. Breslin suffered significant mood symptoms, either depressive or manic, prior to the litigation with Omnicare and its affiliates." (BF ¶ 34 (quoting Breslin Ex. 24 at 5)). In January 1986, Dr. Sholomskas reported that Mr. Breslin had "[n]o depressive symptoms" and was "not suicidal." (Breslin Ex. 23 at 42).

In 1998, Mr. Breslin's primary care physician, Dr. Mark Schwartz, assumed the task of prescribing lithium for Mr. Breslin, as Mr. Breslin was no longer seeing a psychiatrist. (OF ¶ 43; Breslin Ex. 20 at 25, 76). Several years later, in January 2001, Mr. Breslin informed Dr. Schwartz that he had ceased taking lithium more than seven months earlier. (OF ¶ 44; BF ¶¶ 43–44). Although Dr. Schwartz did not consider Mr. Breslin's decision to stop the lithium without consulting a psychiatrist to be a good idea, he noted that Mr. Breslin was happy and he did not encourage Mr. Breslin to continue with the medication or to see a psychiatrist. (Omnicare Ex. AA at 114; Breslin Ex. 20 at 83). Dr. Schwartz also believed that at the time, Mr. Breslin's bipolar disorder was in complete remission. (Breslin Ex. 20 at 85–86).

In 2003, during the months before his death, Mr. Breslin spoke to Dr. Schwartz about the lawsuit with the Omnicare Parties and his feelings of stress. (Breslin Ex. 20 at 97–98). Dr. Schwartz recalled that Mr. Breslin "told me that he was under enormous stress at this point of his life because he was being sued. And he told me the circumstances about this and we spent, I remember, a lot of time about this." (*Id.* at 97). In particular, Mr. Breslin told Dr. Schwartz that the Omnicare Parties "had decided to go after him personally and to get him and that they were going to do everything they could to bring him down and they were going to impoverish him." (*Id.* at 98). Dr. Schwartz described his own reaction to hearing Mr. Breslin's description of the lawsuit as follows:

> Here he had been so happy in his life. He had remarried. After a great deal of difficulty he had finally been able to father this beautiful little girl, was so proud of her, was so delighted, was so happy in his life and then he was being tortured by this huge company that was determined to get him. And it was just very, very upsetting because I knew Curt for so long, he was such a nice guy, and he had been through so much and

was doing so well and was so, so happy and then this happened.

(*Id.* at 99).

Additionally Breslin wrote several e-mails during the months before his death in which he indicated that he was struggling with the litigation and with his emotional condition. On February 12, 2003, about four months before his death, Mr. Breslin wrote an e-mail in which he discussed the litigation. (Breslin Ex. 46). Therein, Mr. Breslin stated, "I certainly fear the unknown and the emotional drain this case can have upon me, but I also believe that I am right and should not have to be abused by [the Omnicare Parties'] bullying tactics." (BF ¶ 46 (quoting Breslin Ex. 46)). On March 21, 2003, Mr. Breslin wrote an e-mail to his parents thanking them for a gift. (Omnicare Ex. FF). In that e-mail, Mr. Breslin stated in relevant part:

> I have just been feeling totally overwhelmed the last couple of weeks and fearful of slipping. I think I hit my all time low last Monday Morning and was a bit scared of the direction I was going. I was starting to get those same shaky feelings of slipping into a deep depression I had 15 and 20 years ago. It really scared me.
>
> I walked into our downstairs bathroom where all the family pictures are hanging on the wall, had a quick cry, regrouped and realized that I had too much to lose to feel sorry for myself. I am truly blessed and have everything to be greatful (sic) for. These last 14 years with Linda and the baby have been the most wonderful of my life. Knowing where I came from with the loneliness and isolation that I constantly faced and where I am today, I really am lucky.
>
> I gave myself a Flossy peptalk and decided there is only so much I can control

and have to decide what I can impact upon and what is out of my hands.

(*Id.*). Subsequently, on June 1, 2003, three days before his death, Mr. Breslin wrote an email to his attorney in which he stated that the lawsuit with the Omnicare Parties "is really starting to take a toll on me emotionally without even mentioning financially. For all its intent, this lawsuit is working for Omnicare." (Breslin Ex. 47).

As of the day he committed suicide, Mr. Breslin had not received therapy from a mental health professional in almost five years and had not taken lithium for three years. (OF ¶¶ 35, 47). However, both Mr. Breslin's former psychiatrist, Dr. Sholomskas, and Mr. Breslin's physician, Dr. Schwartz, were surprised that Mr. Breslin had committed suicide, and Dr. Schwartz believed that it was directly related to the lawsuit. (BF ¶¶ 39–42, 43–44). Furthermore, Breslin's expert, Dr. Lowenthal, opined that "the stress and mental anguish associated with the lawsuit brought by Omnicare against Breslin Associates was a substantial factor in bringing about Mr. Breslin's suicide." (Breslin Ex. 24 at 7–8).

### The Aftermath of Mr. Breslin's Death

On June 4, 2003, after picking her daughter up from daycare, Mrs. Breslin came home and discovered her husband's body hanging in the garage. (BF at p. 42–43). Breslin has presented testimony from Mrs. Breslin describing the events leading up to and following the discovery of her husband, including her efforts to protect her daughter and to find help. (Breslin Ex. 15 at 279–288). In a sworn statement that Mrs. Breslin prepared for the police regarding the facts and circumstances of her husband's death, Mrs. Breslin stated that her husband "had recently been involved in some rather significant litigation, which had caused him some amount of emotional distress. Additionally, she indicated that Curtis Breslin suffered from

depression, but had not been treated for this depression." (Breslin Ex. 48 at 3). She further stated that "she had no reason to believe that her husband planned to take his life." (*Id.*).

Mrs. Breslin testified that although neither she nor her daughter experienced any physical injuries, the first six months were very hard and she sought assistance from a social worker. (Breslin Ex. 15 at 356–58). According to Mrs. Breslin, her husband's death has had a tremendous impact on her life. (BF at p. 43).

Additional factual details relevant to the court's analysis are described below.

## III. *ANALYSIS*

### A. *Summary Judgment Standard of Review*

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "A dispute is 'genuine' if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party." *Sanchez v. Alvarado,* 101 F.3d 223, 227 (1st Cir.1996) (quotations and citations omitted). A material fact is one which has the "potential to affect the outcome of the suit under the applicable law." *Id.* (quotations and citations omitted).

The moving party bears the initial burden of establishing that there is no genuine issue of material fact. *See Celotex*

*Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). If that burden is met, the opposing party can avoid summary judgment only by providing properly supported evidence of disputed material facts that would require trial. *See id.* at 324, 106 S.Ct. at 2553. The non-moving party "may not rest upon mere allegation or denials of his pleading," but must set forth specific facts showing that there is a genuine issue for trial. *LeBlanc v. Great Am. Ins. Co.,* 6 F.3d 836, 841 (1st Cir.1993) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986)). The court must view the record in the light most favorable to the non-moving party and indulge all reasonable inferences in that party's favor. *See O'Connor v. Steeves,* 994 F.2d 905, 907 (1st Cir.1993). "If, after viewing the record in the non-moving party's favor, the Court determines that no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law, summary judgment is appropriate." *Walsh v. Town of Lakeville,* 431 F.Supp.2d 134, 143 (D.Mass.2006).

### B. *BAC's Counterclaims*

The Omnicare Parties have moved for summary judgment on BAC's counterclaims for defamation, tortious interference with its current and prospective contractual and business relationship with Aurum, abuse of process and violation of Chapter 93A.[5] As set forth below, this court finds that BAC has presented sufficient evidence to create a genuine issue of material fact and to warrant a jury trial on each of these claims.[6]

---

**5.** Although the Omnicare Parties have moved for summary judgment on all of the counterclaims asserted by BAC and the individual counterclaim plaintiffs, they have not addressed in their briefs BAC's counterclaim for injurious falsehood. (See Docket No. 6

¶¶ 54–58). Therefore, their motion is waived with respect to that claim. *See Kelley v. La-Force,* 288 F.3d 1, 9 (1st Cir.2002) (arguments not briefed are waived).

**6.** Although Breslin has not filed a motion for summary judgment, it urges the court to

### 1. *Defamation*

The Omnicare Parties argue that they are entitled to summary judgment on BAC's defamation claim because, as an initial matter, the scope of BAC's claim should be defined by the specific defamatory statements that BAC alleged in its counterclaim, and those statements were never made. (Omnicare Mem. (Docket No. 113) at 10). They further argue that they are entitled to a judgment in their favor because the allegedly defamatory statements constitute inactionable expressions of opinion and because BAC has not presented evidence showing that it was harmed by the statements. (*Id.* at 11–12). This court finds these arguments unpersuasive and recommends that the motion for summary judgment on the defamation claim be denied.

### *Scope of the Defamation Claim*

■ "Defamation is the publication of material by one without a privilege to do so which ridicules or treats the plaintiff with contempt." *Correllas v. Viveiros*, 410 Mass. 314, 319, 572 N.E.2d 7, 10 (1991). Claims for defamation are subject to the notice pleading requirements set forth in Fed.R.Civ.P. 8 rather than the heightened pleading requirements of Rule 9. *Davidson v. Cao*, 211 F.Supp.2d 264, 276 (D.Mass. 2002). *See also Bleau v. Greater Lynn Mental Health & Retardation Assoc.*, 371 F.Supp.2d 1, 2 (D.Mass.2005) (noting that the First Circuit has effectively overturned cases requiring a heightened pleading standard for defamation claims). Consequently, plaintiffs are not required to set forth the alleged defamatory statements verbatim. *Davidson*, 211 F.Supp.2d at 276. Rather, BAC was required only to set forth such allegations in support of its defamation claim that were sufficient to give the Omnicare Parties "fair notice" of its claim and the grounds upon which it rests. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512, 122 S.Ct. 992, 998, 152 L.Ed.2d 1 (2002).[7]

■ In its counterclaim, BAC alleged in relevant part as follows:

> Thus, upon information and belief, plaintiffs' representatives (also representing Omnicare) contacted senior representatives of Aurum, Breslin's client, and stated that not only was the Audit Re-

grant it summary judgment on the claims asserted against BAC. In particular, Breslin argues that it is apparent that it is entitled to a judgment on these claims because "Omnicare brought a baseless lawsuit against BAC when it knew or should have known that BAC enjoyed a qualified privilege in conducting its audit and providing it to Aurum." (Breslin Mem. (Docket No. 120) at 40). Since no advance notice was given to the Omnicare Parties that the court might exercise its inherent power to grant summary judgment sua sponte, this court declines to entertain BAC's request. *See Rogan v. Menino*, 175 F.3d 75, 79 (1st Cir.1999).

7. The Omnicare Parties rely on language in *Phantom Touring, Inc. v. Affiliated Publ'ns*, 953 F.2d 724 (1st Cir.1992), to support their claim that BAC's defamation claim must be limited to the precise language in the counterclaim. In *Phantom*, the court refused to al-

low the plaintiff to rely on a newspaper article which had not been referenced in the complaint, noting that "[i]n our view, a defendant is entitled to knowledge of the precise language challenged as defamatory, and the plaintiff therefore is limited to its complaint in defining the scope of the alleged defamation. If plaintiff wished to enlarge its case beyond the six [newspaper] articles originally challenged, it should have sought to amend the complaint." *Id.* at 728 n. 6. Nothing in the court's language or holding suggests that a party's defamation claim is confined to specific words set forth in its pleading. Rather, the court limited the plaintiff to the articles referenced in the complaint. *Phantom*, therefore, is consistent with this court's conclusion that a party must provide sufficient notice regarding the scope of its defamation claim, but is not obligated to quote the language verbatim in the complaint.

port wrong, but additionally that Mr. Breslin was incompetent, not to be trusted, and should be fired by Aurum and replaced by another auditor, and that plaintiffs and Omnicare would not attend any meeting attended by Mr. Breslin and would not discuss or address Breslin's Audit Report ... Plaintiffs' statements (and those of their parent Omnicare) concerning the purported lack of competence and trustworthiness of [BAC] and its CEO Mr. Breslin were false and defamatory and were known by the plaintiff Pharmacies and Omnicare and their representatives to be false and defamatory when made.

(Omnicare Ex. D ¶¶ 44–45). Thus, BAC described the context in which the allegedly defamatory statements were made and provided an indication as to the timing of the statements and the identity of the person or persons to whom the statements were made. Furthermore, BAC put the counterclaim defendants on notice that the allegedly defamatory statements impugned both the competence and trustworthiness of BAC and its CEO.

Following discovery and development of the evidence, BAC has more precisely defined its defamation claim as being based on statements that Mr. Lozier made to Ms. Melendy shortly after the June 26, 2002 Aurum meeting described above. The statements are described by Ms. Melendy in her deposition and in two e-mails that Mr. Lozier wrote on June 28, 2002. (Breslin Mem. (Docket No. 120) at 28). Specifically, Ms. Melendy testified as follows:

[Mr. Lozier] asked me on the telephone, he said did I know who I was dealing with, that Mr. Breslin had done some work in Connecticut and that **he did not perform that work in an ethical manner.** He asked me how much we were paying Curt Breslin. **He said to me**

**that he does not have a background in doing audits** and he asked me again how much were we paying him. He said to me that they did not intend to deal with Curt Breslin.

(BF ¶¶ 28–29; see also Breslin Ex. 7 at 32–33).[8] Furthermore, Mr. Lozier, in the first of two e-mails concerning his discussion with Ms. Melendy, stated in relevant part:

I spoke with Kathryn Melendy, CEO, this morning for about twenty minutes. **I explained to her that we have learned more about Mr. Breslin since our meeting on Wednesday and that we had some serious concerns with his work. I explained how Omnicare had contracted with him in Connecticut and that the work performed contained numerous errors and that he then proceeded to breach confidentiallty [sic] rules and shared our information with our competition in Connecticut.** I informed her that our initial review of the document that he produced for Aurum also contained numerous errors and **we did not believe that he had the expertise to perform a pharmacy audit.** She suggested that we sit down with Curt to discuss the errors and that she knew there probably were some areas that needed to be corrected. I stated that we did not want to come back to the table to meet with Curt and that **Omnicare was in the process of putting together a law suit as a result of the Connecticut situation.** I also informed her that we are confident in the pricing that we provided to the Aurum members and that **we did not want to put in the effort to correct Mr. [Breslin's] work.**

(BF ¶¶ 28–29; see also Breslin Ex. 36). In his second e-mail, Mr. Lozier further stated:

8. The alleged defamatory statements are set forth in bold typeface.

I spoke with Kathryn Melendy again this afternoon regarding the Breslin audit. I presented information on errors including perdiem errors, undercharges, as well as the problems with AWP. She explained that she was taken aback by Omnicare's position that we were not willing to resolve the issues on Breslin's report. **I explained again that there were numerous problems with Curt and his work in Connecticut, that Curt is not an accountant, nor a pharmacist and that he is just not qualified to perform this audit and that he violated his own business code by sharing confidential information with our competition. I suggested that what he did would be the equivalent of Price Waterhouse performing an audit for Omnicare and then going to Pharmerica and sharing our pricing and customer information with them.** I told her that if we were to work with Curt it would validate his efforts and that we just could not do that.

(*Id.*). Thus, while Mr. Lozier did not use the precise words "incompetent" or "untrustworthy," his statements effectively conveyed to Ms. Melendy that BAC and Mr. Breslin were not competent to perform the audit and that Mr. Breslin was unethical and could not be trusted. Therefore, Mr. Lozier's alleged defamatory remarks are entirely consistent with the language and scope of BAC's defamation claim as alleged in BAC's pleadings.

### Statements of Fact v. Statements of Opinion

■ The Omnicare Parties also seek summary judgment on the ground that the alleged defamatory statements consisted of subjective expressions of opinion and are therefore not actionable. It is true that statements of opinion are not actionable because they are protected under the First Amendment. See *Lyons v. New Mass*

*Media, Inc.*, 390 Mass. 51, 59, 453 N.E.2d 451, 457 (1983). However, only pure opinion, as opposed to "an expression of opinion that implies a false assertion of fact[,]" is entitled to such protection. *Reilly v. Associated Press*, 59 Mass.App.Ct. 764, 770, 797 N.E.2d 1204, 1210–11 (2003). Therefore, "a cause of action for defamation may still be sustained where an opinion 'implies the allegation of undisclosed defamatory facts as the basis for the opinion.'" *Yohe v. Nugent*, 321 F.3d 35, 41 (1st Cir.2003) (quotation omitted).

Under Massachusetts law,

[d]istinguishing whether a challenged statement is one of fact or opinion has been characterized as a question of law ... if the statement' unambiguously constitutes either fact or opinion. Where, ... however, the allegedly [slanderous] remarks could have been understood by the average [listener] in either sense, the issue must be left to the jury's determination.

*Lyons*, 390 Mass. at 59, 453 N.E.2d 451 (internal quotations and citations omitted). Therefore, the question before the court on a motion for summary judgment "is whether the allegedly [defamatory] statement 'can reasonably be [understood] as stating a fact.'" *Id.* at 60, 453 N.E.2d 451 (quotation omitted). In making this determination, the "court must 'examine the statement in its totality in the context in which it was ... published.'" *Reilly*, 59 Mass.App.Ct. at 770, 797 N.E.2d 1204 (quoting *Lyons v. Globe Newspaper Co.*, 415 Mass. 258, 263, 612 N.E.2d 1158, 1162 (1993)). In other words, "[t]he court must consider all the words used, not merely a particular phrase or sentence. In addition, ... the court must consider all the circumstances surrounding the statement, including the medium by which the statement is disseminated and the audience to

which it is published." *Id.* (quotation omitted).

Applying these principles to the instant case, this court finds that the challenged statements are either clearly statements of fact or are opinions that imply an assertion of fact. Therefore, they are appropriately left to be evaluated by a jury.

Fundamentally, Breslin objects to the statements which question Mr. Breslin's ethics on the grounds that he disseminated confidential information—an accusation which may or may not be true. Similarly, Breslin objects to the statements challenging his qualifications to perform the audit. Again, the Omnicare Parties' contentions that Mr. Breslin "did not have a background doing audits," or that his work "contained numerous errors" are assertions of fact. The same is true with respect to the representation that because of Mr. Breslin's actions, Omnicare "was in the process of putting together a law suit as a result of the Connecticut situation."[9] "[A]ccusations which can be proved true or false at trial" are statements of fact. *Lyons,* 390 Mass. at 60, 453 N.E.2d at 458. Furthermore, "[s]tatements suggesting that one lacks a necessary professional characteristic are defamatory." *Reilly,* 59 Mass.App.Ct. at 778, 797 N.E.2d at 1216. In sum, the question whether the challenged statements are defamatory should be decided by a jury.

### Harm to BAC

 The Omnicare Parties further argue that Breslin has failed to make a showing that BAC, as opposed to Mr. Breslin, suffered any harm to its reputation as a result of Mr. Lozier's statements. They also assert, based on the undisputed testimony of Ms. Melendy, that BAC can-

not prove that it suffered any damages because the statements did not affect Aurum's impression of Mr. Breslin or BAC. (Omnicare Reply Mem. (Docket No. 128) at 19–20). This court finds that Breslin has presented sufficient evidence to overcome the Omnicare Parties' motion on these grounds.

"One who publishes defamatory matter concerning a corporation is subject to liability to it ... if the corporation is one for profit, and the matter tends to prejudice it in the conduct of its business or to deter others from dealing with it...." *Restatement (Second) of Torts* § 561(a). See also *Eyal v. Helen Broad. Corp.,* 411 Mass. 426, 433, 583 N.E.2d 228, 232 (1991) (statement holding corporation up to disdain or disfavor in the community is capable of being found defamatory). Accordingly, in order to withstand a motion for summary judgment, BAC must present evidence showing, *inter alia,* that "[t]he defendant made a statement, concerning [BAC], to a third party." *Ravnikar v. Bogojavlensky,* 438 Mass. 627, 629, 782 N.E.2d 508, 510 (2003). In the instant case, Mr. Lozier's words, on their face, referred only to Mr. Breslin. Nevertheless, under Massachusetts law,

> a defamation plaintiff [may] prove that the defendant's words were "of and concerning" him by showing "either that the defendant intended its words to refer to the plaintiff and that they were so understood, *or* that the defendant's words reasonably could be interpreted to refer to the plaintiff and that the defendant was negligent in publishing them in such a way that they could be so understood."

---

9. Although it is undisputed that the Omnicare Parties considered bringing a lawsuit against BAC in connection with the CALTC audit, there is a question of fact as to whether, by

the time Mr. Lozier spoke to Ms. Melendy, the Omnicare Parties had decided to abandon the idea. (BF ¶¶ 28–29 n. 12).

*Eyal,* 411 Mass. at 430, 583 N.E.2d at 230–31. Thus, a corporation may be defamed by communications defamatory of its officers and agents that also "reflect discredit upon the method by which the corporation conducts its business." *Restatement (Second) of Torts* § 561(a), Comment *b* to Clause (a). In the instant case, it should be left to the jury to determine whether BAC was defamed by Mr. Lozier's words.

The evidence is that BAC was a one man operation run by Mr. Breslin, that the Omnicare Parties treated BAC and Mr. Breslin interchangeably, that Mr. Breslin was responsible for all of the work performed on the CALTC and Aurum audits, and that the Omnicare Parties' criticism of Mr. Breslin was aimed at discrediting both him and the work of BAC. Accordingly, Breslin has presented sufficient evidence to show that the alleged defamatory statements concerned BAC and were intended to discredit the manner in which it conducted business.

■ The Omnicare Parties have also moved for summary judgment on the grounds that, based on Ms. Melendy's continued respect for Mr. Breslin and BAC, BAC cannot produce any evidence that it suffered damages to its reputation as a result of Mr. Lozier's statements. However, BAC is not obligated to establish a financial loss in order to pursue its defamation claim.

"[A] corporation might recover for damage to its reputation for conducting its affairs honestly or competently without establishing out-of-pocket damages." *Dexter's Hearthside Rest., Inc. v. Whitehall Co.,* 24 Mass.App.Ct. 217, 220, 508 N.E.2d 113, 116 (1987), rev. *denied,* 400 Mass. 1104, 511 N.E.2d 620 (1987). *See also Restatement (Second) of Torts* § 561(a), Comment *b* to Clause (a) ("a corporation may maintain an action for defamatory words that discredit it and tend to cause

loss to it in the conduct of its business, without proof of special harm resulting to it"). Moreover, "[a]ctual harm to reputation [is] not necessary to make [a] communication defamatory ... Its character depends upon its general tendency to have such an effect." *Restatement (Second) of Torts* § 559, Comment *d.* Thus, to withstand a motion for summary judgment, a plaintiff must show that the "statement *could* damage the plaintiff's reputation in the community" and that the statement "either caused the plaintiff economic loss ... or is actionable without proof of economic loss." *Ravnikar,* 438 Mass. at 629–30, 782 N.E.2d at 510–11 (emphasis added). Statements such as those at issue in the instant case "that may prejudice the plaintiff's profession or business" are actionable "without proof of economic loss[.]" *Id.* at 630, 782 N.E.2d at 511. *See also Dexter's Hearthside Rest., Inc.,* 24 Mass. App. at 219–20, 508 N.E.2d at 115–16 (defendant not entitled to summary judgment based on plaintiff's failure to show that defamatory statement had impact on plaintiff's customers or others in the industry); *Shafir v. Steele,* 431 Mass. 365, 373, 727 N.E.2d 1140, 1146 (2000) (plaintiff entitled to at least nominal damages where plaintiff proved libel, a type of defamation which is actionable without proof of economic loss). For these reasons, the Omnicare Parties are not entitled to summary judgment on BAC's defamation claim.

### 2. *Tortious Interference*

■ BAC claims that the Omnicare Parties interfered with its current and prospective contractual and business relationship with Aurum "by making false statements to Aurum concerning the competence and trustworthiness of [BAC] and its CEO, by refusing to attend meetings with Breslin and Aurum to discuss Breslin's Audit Report, and by suggesting to

Aurum that Breslin be fired." (Omnicare Ex. D ¶ 49). The Omnicare Parties argue that they are entitled to summary judgment on this claim because the Omnicare Parties' refusal to deal with BAC is insufficient to support such a claim and BAC has presented no evidence that it suffered any loss of business or business advantage as a result of the Omnicare Parties' conduct. (Omnicare Mem. at 12–13). This court finds that the evidence presented warrants the denial of the motion for summary judgment.

The SJC has adopted the Restatement (Second) of Torts § 766A (1979), which provides:

One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person, by preventing the other from performing the contract or causing his performance to be more expensive or burdensome, is subject to liability to the other for the pecuniary loss resulting to him.

*Shafir*, 431 Mass. at 369–70, 727 N.E.2d at 1143–44. Thus, in order to prove its claim, BAC must establish that the Omnicare Parties interfered with BAC's ability to perform its contract with Aurum "through improper motive or means" and that BAC experienced a "loss of advantage [which] resulted directly from the [Omnicare Parties'] conduct." *Fafard Real Estate & Dev. Corp. v. Metro–Boston Broad., Inc.*, 345 F.Supp.2d 147, 154 (D.Mass.2004) (citation omitted).

The undisputed evidence shows that the Omnicare Parties' refusal to communicate with Mr. Breslin in connection with the ongoing audit made completion of the audit process impossible, and that Aurum would have continued to use BAC to perform additional auditing work if the Omnicare Parties had not refused to deal with Mr. Breslin. Thus, there is sufficient evidence

for a jury to find that the Omnicare Parties interfered with BAC's ability to perform its contract and that BAC lost the Aurum contract as well as work in the future as a result. Such evidence establishes that BAC experienced "actual damage to an economic relationship or prospective relationship." *Ratner v. Noble*, 35 Mass.App.Ct. 137, 138, 617 N.E.2d 649, 650 (1993). *See also Fafard Real Estate & Dev. Corp.*, 345 F.Supp.2d at 154 (allegations showing the loss of "a probable future business relationship from which there is a reasonable expectancy of financial benefit" adequate to support claim for tortious interference with advantageous relations) (quotations and citations omitted).

Moreover, there is sufficient evidence for a jury to find that the Omnicare Parties acted through improper motive or means. As the Omnicare Parties have argued, simply refusing to deal with a party, without more, cannot support a claim for tortious interference. *See Spencer Cos., Inc. v. Chase Manhattan Bank, N.A.*, 81 B.R. 194, 204 (D.Mass.1987). Nevertheless, by taking a position which precluded BAC from completing its audit and affirmatively prevented Aurum from using BAC in the future, among other things, the Omnicare Parties' conduct went well beyond a mere refusal to deal. There is sufficient evidence to support BAC's claim of tortious interference. *See Gen. Elec. Co. v. Lyon*, 894 F.Supp. 544, 551 (D.Mass. 1995) (allegations that party prevented counterclaim plaintiff from performing contractual obligations by prohibiting others from doing business with counterclaim plaintiff, and that party pressured counterclaim plaintiff's customer to cancel order, went beyond mere refusal to deal and supported tortious interference claim). For these reasons, the Omnicare Parties are

not entitled to summary judgment with respect to this claim.

### 3. *Abuse of Process*

■ BAC alleges, in support of its abuse of process claim, that the Omnicare Parties "sought to silence [BAC's] critique of their billing practices by maliciously initiating this action which they knew was without merit, and which they also knew would put an unbearable strain on the finances of [BAC]...." (Omnicare Ex. D ¶ 62). BAC further alleges that the lawsuit "constitutes a malicious and egregious abuse of process of this Court employed for the ulterior and improper purpose of stifling and silencing the legitimate inquiry and audit of the billing practices of the Omnicare network of institutional pharmacies." (*Id.* ¶ 63). The Omnicare Parties contend that they are entitled to summary judgment on this claim because BAC has presented no evidence showing that the litigation was brought for an ulterior purpose. (Omnicare Mem. at 14–15). However, this court finds that the evidence, when viewed in the light most favorable to BAC, could support a conclusion that the Omnicare Parties filed the lawsuit for the illegitimate purpose of silencing BAC's auditing work by injuring its business and reputation.

"The elements of the tort of abuse of process in Massachusetts are: (1) that process is used (2) for an ulterior or illegitimate purpose, (3) resulting in damage to the plaintiff." *Refuse & Envtl. Sys., Inc. v. Indus. Servs. of Am., Inc.*, 932 F.2d 37, 41 (1st Cir.1991). Thus, "[t]o prevail on an abuse of process claim it must appear that the process was used to accomplish some ulterior purpose for which it was not designed or intended, or which was not the legitimate purpose of the particular process employed." *Broadway Mgmt. Servs. Ltd. v. Cullinet Software, Inc.*, 652 F.Supp.

1501, 1502 (D.Mass.1987). "Mere knowledge that a claim is groundless is not sufficient in and of itself to establish an abuse of process. 'There must also be proof of an ulterior motive.'" *Fafard Real Estate & Dev. Corp.*, 345 F.Supp.2d at 153 (quoting *Ladd v. Polidoro*, 424 Mass. 196, 200, 675 N.E.2d 382, 385 (1997)). Similarly, abuse of process cannot be shown by evidence of "an intention to cause a party to expend substantial time and money to defend against the claims in a suit...." *Broadway Mgmt. Servs. Ltd.*, 652 F.Supp. at 1503. "[T]he cases show that 'ulterior motive' is more than the intent to harass; there must be intention to use process for coercion or harassment to obtain something not properly part of the suit." *Id.*

In the instant case, BAC does more than argue that the suit against it is frivolous—a conclusion which is obviously hotly contested. Similarly, BAC's argument goes beyond its claim that the Omnicare Parties wrongfully caused BAC to incur a substantial financial burden to defend this action. Rather, BAC contends that the Omnicare Parties' ulterior purpose in bringing the lawsuit was to put BAC out of the pharmacy auditing business. (*See* BF ¶¶ 30–31). "The First Circuit has recognized that the desire to injure a business or business reputation is an improper ulterior motive sufficient to state a claim for abuse of process." *Gen. Elec. Co.*, 894 F.Supp. at 552 (citing *Poduska v. Ward*, 895 F.2d 854, 856 (1st Cir.1990)).

Viewing the evidence in the light most favorable to BAC, a jury may find that BAC's work on the CALTC audit exposed inaccuracies in Omnicare's billing practices that Omnicare was unable to dispute and that led to a settlement costing Omnicare over half a million dollars. Mr. Stamps reacted to BAC's audit results by displaying hostility toward Mr. Breslin personally, and Omnicare ultimately negotiated a new

contract with CALTC pursuant to which Omnicare refused to allow BAC to perform further auditing work for CALTC. Notwithstanding Omnicare's efforts to avoid further auditing by BAC, however, Omnicare encountered BAC once again in connection with the Aurum audit. A jury could conclude, given this evidence, that when the Omnicare Parties received BAC's initial results from the Aurum audit, they were motivated by a desire to prevent BAC from auditing any more of their entities.[10]

A jury also could conclude that the Omnicare Parties' reaction to the Aurum audit was unreasonable and that their decision to file litigation against BAC was vindictive. The evidence shows that the results of BAC's audit reports were not final, but were subject to revision following discussions with the pharmacies. Nevertheless, instead of engaging in any such discussions, the Omnicare Parties disparaged Mr. Breslin, refused to have any further dealings with him, and brought the instant litigation based upon what were still initial reports and without even reviewing the latest draft of the report. A jury could infer from this evidence that the Omnicare Parties' reaction to the audit results was unreasonable and that their decision to sue BAC was motivated by a desire to hurt BAC's ability to conduct its auditing business. This is sufficient to defeat the motion for summary judgment with respect to the abuse of process claim. *See Refuse & Envtl. Sys., Inc.*, 932 F.2d at 42 (court properly denied defendant's motions for directed verdict and judgment n.o.v. on abuse of process count where jury could reasonably have inferred that defendant knowingly and intentionally used a baseless lawsuit to attempt to drive plaintiff out of business).

### 4. BAC's Claim Under Chapter 93A

■ The parties agree that BAC's claim for violation of Chapter 93A rests on its claims for abuse of process, defamation and tortious interference. (Omnicare Mem. at 19; Omnicare Ex. D ¶ 67). Because this court finds that the Omnicare Parties are not entitled to summary judgment on the underlying claims, this court recommends that its motion be denied with respect to BAC's claim under Chapter 93A as well. "The misuse of legal process to obtain a commercial advantage has long been recognized as a violation of Chapter 93A." *Fafard Real Estate & Dev. Corp.*, 345 F.Supp.2d at 154. Moreover, BAC may prove a "loss of money or property" within the meaning of Chapter 93A § 11 by showing that it was forced to incur attorney's fees and other costs in defending such a lawsuit. *See Tech Plus, Inc. v.*

---

10. The Omnicare Parties argue that "silencing" BAC cannot be an ulterior motive because that is precisely what the lawsuit was aimed at doing. In particular, they argue that the lawsuit sought to "silence" BAC by enjoining it from publishing false and defamatory statements regarding North Shore and Value to persons with whom they do business and statements that the pharmacies overcharged Aurum or breached the Omnicare Parties' agreement with Aurum. (Omnicare Reply Mem. at 16–17). Where the stated and actual objective of a lawsuit is the same, there is no hidden agenda and therefore no ulterior motive supporting an abuse of process claim.

*See Silvia v. Bldg. Inspector of W. Bridgewater,* 35 Mass.App.Ct. 451, 454, 621 N.E.2d 686, 688 (1993). However, the Omnicare Parties are reading BAC's abuse of process claim too narrowly. A fair reading establishes that BAC is claiming that the Omnicare Parties improperly brought the instant action in order to harm BAC's reputation and drive it out of the auditing business. Thus, although the stated objective of the lawsuit was to "silence" BAC by preventing it from making defamatory or otherwise harmful statements, BAC is claiming that the ulterior motive was to "silence" BAC by destroying its business.

*Ansel,* 59 Mass.App.Ct. 12, 21, 793 N.E.2d 1256, 1264 (2003).

### C. Claims by Individual Counterclaim Plaintiffs

The Omnicare Parties also have moved for summary judgment on all of the claims asserted by the individual counterclaim plaintiffs, including their claims for intentional infliction of emotional distress, wrongful death and violation of Chapter 93A. For the reasons that follow, this court finds that the motion for summary judgment should be denied as to all of these claims.

### 1. Intentional Infliction of Emotional Distress

The Omnicare Parties contend that they are entitled to summary judgment on the claims of Mr. Breslin, Mrs. Breslin and Carly Breslin for intentional infliction of emotional distress. Specifically, they argue that the record contains no evidence that they intended to cause any of the Breslins' emotional distress or that the Omnicare Parties engaged in conduct that could be considered extreme and outrageous. (Omnicare Mem. at 21–26; Omnicare Reply Mem. at 6–10). They further assert that the claims must fail because the extent of Mr. Breslin's emotional distress was unreasonable under the circumstances. (Omnicare Mem. at 27–28; Omnicare Reply Mem. at 11–13). Additionally, with respect to Linda and Carly Breslin, the Omnicare Parties contend that they cannot recover because they did not suffer any physical harm. (Omnicare Mem. at 28 n. 32). For the reasons detailed herein, these arguments are without merit.

#### Mr. Breslin's Claim

■ In order for a direct victim to prevail on a claim for intentional infliction of emotional distress, "a plaintiff must show (1) that the defendant intended to cause, or should have known that his conduct would cause, emotional distress; (2) that the defendant's conduct was extreme and outrageous; (3) that the defendant's conduct caused the plaintiff's distress; and (4) that the plaintiff suffered severe distress." *Sena v. Commonwealth,* 417 Mass. 250, 263–64, 629 N.E.2d 986, 993 (1994) (quoting *Agis v. Howard Johnson Co.,* 371 Mass. 140, 145, 355 N.E.2d 315 (1976)). *See also Yohe,* 321 F.3d at 42. "To be considered extreme and outrageous, the defendant's conduct must be 'beyond all bounds of decency and ... utterly intolerable in a civilized community.'" *Sena,* 417 Mass. at 264, 629 N.E.2d at 993. A jury determining whether a defendant's conduct is extreme and outrageous in a particular case is "entitled to draw reasonable inferences from the totality of the circumstances." *Boyle v. Wenk,* 378 Mass. 592, 595, 392 N.E.2d 1053, 1055 (1979). Thus, evidence that the defendant engaged in a "pattern of conduct" or "[r]epeated harassment" "may compound the outrageousness of incidents which, taken individually, might not be sufficiently extreme to warrant liability for infliction of emotional distress." *Id.* at 595, 392 N.E.2d at 1055–56.

■ As described above, the record supports an inference that the Omnicare Parties, angered by their prior experience with Mr. Breslin on the CALTC audit and by BAC's initial results on the Aurum audit, refused the opportunity to challenge BAC's preliminary conclusions on the Aurum audit and instead took steps designed to destroy BAC's and Mr. Breslin's reputation and business prospects, including disparaging Mr. Breslin to his client, filing a lawsuit against his company, making it impossible for BAC to complete the Aurum audit, and effectively foreclosing Mr. Breslin's opportunity to perform future work for Aurum and others in the indus-

try. Under these circumstances, a jury reasonably could conclude that the Omnicare Parties knew or should have known that their actions would cause Mr. Breslin to suffer emotional distress.

A reasonable jury also could conclude that the Omnicare Parties' actions were extreme and outrageous. For example, the jury may determine, after viewing all of the circumstances, that the Omnicare Parties engaged in a pattern of conduct amounting to a concerted effort to drive Mr. Breslin out of business. Such evidence is comparable to facts in other cases in which courts have concluded that there were sufficient facts or allegations to support a finding that the defendant's actions were extreme and outrageous. *See, e.g., McCarthy v. Szostkiewicz*, 188 F.Supp.2d 64, 72–73 (D.Mass.2002) (denying motion for summary judgment on claim for intentional infliction of emotional distress where facts showed that defendant expressed animosity toward plaintiff and denied plaintiff a promotion, which ultimately led to plaintiff's suicide); *Fletcher v. Szostkiewicz*, 190 F.Supp.2d 217, 232 (D.Mass.2002) (denying motion for summary judgment on emotional distress claim where evidence showed that defendant mayor gave plaintiff three day suspension from employment as police officer for testifying against defendant at a Civil Service Commission hearing and distributing a brochure criticizing defendant during his re-election campaign); *Agis*, 371 Mass. at 145, 355 N.E.2d at 319 (allegations that restaurant manager had fired employees systematically, beginning with plaintiff, in an attempt to identify a suspected thief, sufficient to sustain claim for intentional infliction of emotional distress). *See also Foley v. Polaroid Corp.*, 400 Mass. 82, 100, 508 N.E.2d 72, 82 (1987)

(suggesting that evidence showing that defendant "engaged in a pattern of conduct constituting a concerted effort to drive [plaintiff] out of the company" would be sufficient to support a finding that defendant's behavior was extreme and outrageous).

The elements of a claim for intentional infliction of emotional distress "are aimed at limiting frivolous suits and avoiding litigation in situations where only bad manners and mere hurt feelings are involved...." *Agis*, 371 Mass. at 145, 355 N.E.2d at 319 (quotations and citation omitted). Breslin has presented enough evidence to support a finding that the Omnicare Parties' actions were far more egregious than mere bad manners, and it is appropriate for a jury "to make common sense judgments, from the totality of the circumstances," about whether such actions were "extreme and outrageous." *Fletcher*, 190 F.Supp.2d at 232 (internal quotations omitted).

██ Finally, the Omnicare Parties argue that in order to succeed on Mr. Breslin's emotional distress claim, Breslin must show that his emotional distress "was not only 'severe,' but was 'of such a nature that *no reasonable person could be expected to endure it.*' " (Omnicare Reply Mem. at 11) (quoting *Tetrault v. Mahoney, Hawkes & Goldings*, 425 Mass. 456, 466, 681 N.E.2d 1189, 1197 (1997)). They suggest that Breslin cannot make this showing because no reasonable person would react to the Omnicare Parties' conduct by committing suicide, and it was only due to Mr. Breslin's preexisting mental illness that he experienced such a severe level of emotional distress. (*See* Omnicare Mem. at 27–28).[11] This court finds that the Omnicare

---

11. To the extent the Omnicare Parties are arguing that Mr. Breslin's emotional distress damages should be limited to what a reason-

able person would have experienced under the circumstances, that issue does not pertain to liability and this court finds it unnecessary

Parties cannot defeat Mr. Breslin's claim on this basis.

It is up to the jury to decide, "from its own experience," whether the evidence is sufficient to meet the elements of the cause of action, including whether "the emotional distress was severe and of such a nature that no reasonable person could be expected to endure it." *McCarthy*, 188 F.Supp.2d at 72. The fact that a party committed suicide does not alter the jury's role. For example, in the *McCarthy* case, the evidence showed that the plaintiff committed suicide after the defendant failed to promote the plaintiff to the position of captain of the police department. *See id.* at 67–70. The court denied the defendant's motion for summary judgment on the intentional infliction of emotional distress claim, concluding that "[f]rom their own experience jurors are aware of the extent and character of the disagreeable emotions that may result from the defendant's conduct." *Id.* (quoting *Agis*, 371 Mass. at 144, 355 N.E.2d at 318) (alteration in original). The court also noted that "the fact of the suicide is certainly evidence of the distress that [plaintiff] felt." *Id.* Accordingly, the fact that Mr. Breslin committed suicide does not take the case out of the jury's realm of expertise. It is up to a jury to determine whether the evidence presented by the counterclaim plaintiffs is enough to satisfy the requirements of Mr. Breslin's intentional infliction claim.

### Claims Asserted by Linda and Carly Breslin

■ "[T]he Supreme Judicial Court has expanded the tort of intentional infliction of emotional distress beyond the im-

mediate victim to include recovery for family members" although it has done so "cautiously." *Limone v. United States*, 336 F.Supp.2d 18, 44 (D.Mass.2004). Specifically, in *Nancy P. v. D'Amato*, 401 Mass. 516, 517 N.E.2d 824 (1988), the SJC followed the Restatement (Second) of Torts § 46(2) (1965), which "recognizes liability for intentionally or recklessly caused severe emotional distress of a family member who is present when extreme and outrageous conduct is directed at another family member" and "leaves entirely open the possibility in other instances of liability for the intentional or reckless infliction of emotional distress." *Id.* at 521–22, 517 N.E.2d 824, 517 N.E.2d at 827–28. In order to support such a claim, the family member must establish "(a) substantially contemporaneous knowledge of the outrageous conduct and (b) a severe emotional response." *Id.* at 522, 517 N.E.2d at 828. Breslin has submitted sufficient evidence to satisfy both of these elements.

Because Linda and Carly Breslin were living with Mr. Breslin at the time when the allegedly extreme and outrageous conduct by the Omnicare Parties was occurring, "it would be a question for the trier of fact whether [the Omnicare Parties] acted recklessly, indifferent to the likely effect of [their] conduct on family members who would be apt in time to learn of [their] outrageous conduct." *Id.* at 521, 517 N.E.2d at 827. Moreover, contrary to the Omnicare Parties' contention, the individual plaintiffs do not have to establish that they suffered bodily harm. "Unlike cases involving negligently inflicted emotional injuries, [the SJC] has, from early on, al-

to address it at this time. The court notes, however, that *Payton v. Abbott Labs*, 386 Mass. 540, 437 N.E.2d 171 (1982), on which the Omnicare Parties rely to suggest that Mr. Breslin's damages should be limited, con-

cerned a claim for negligent infliction of emotional distress rather than the claim at issue here for intentional infliction of emotional distress.

lowed recovery for intentional or reckless inflictions of emotional injuries even in the absence of attendant physical harm." *Migliori v. Airborne Freight Corp.*, 426 Mass. 629, 632 n. 2, 690 N.E.2d 413, 415 n. 2 (1998). For these reasons, the Omnicare Parties' motion for summary judgment with respect to the emotional distress claims asserted by Linda and Carly Breslin should be denied.

### 2. *Wrongful Death*

Finally, the Omnicare Parties have moved for summary judgment on the wrongful death claim asserted by the individual counterclaim plaintiffs. If the motion is denied, they have requested that the court certify to the SJC questions of law regarding the existence of such a claim in Massachusetts.[12]

On June 22, 2004, this court issued a Report and Recommendation ("R & R") in which it recommended to the district court judge to whom this case is assigned that the Omnicare Parties' motion to dismiss Breslin's wrongful death claim be denied. (Docket No. 55). In doing so, this court predicted, after analyzing the relevant case law, that "Massachusetts is likely to join the 'trend of recent cases' recognizing a cause of action for wrongful death by suicide where the suicide results from an intentional wrong." (R & R at 11). The district court judge adopted the R & R on August 16, 2004. It does not appear that the Massachusetts courts have ruled on the issue since that time.

In their present motion, the Omnicare Parties have not asked this court to revisit its prior determination as to the existence of a cause of action for wrongful death by suicide in Massachusetts. Instead, the Omnicare Parties contend that to the extent such a claim exists, it must be predicated upon a showing of intentional infliction of emotional distress. They further contend that because they are entitled to summary judgment on the intentional infliction claims, they should be entitled to summary judgment with respect to the wrongful death action as well. (Omnicare Mem. at 28–34).

As described above, this court finds that Breslin has presented enough evidence to warrant the denial of summary judgment for the Omnicare Parties on the intentional infliction of emotional distress claims. Accordingly, this court does not have to reach the issue whether such claims are the only potential predicate claim for a wrongful death by suicide claim. Since the intentional infliction claims remain viable, the Omnicare Parties' motion for summary judgment on the wrongful death claim should be denied as well. Moreover, since the factual record of this case needs to be developed at trial, and the same evidence is relevant to the other remaining claims, this court does not recommend that any question be certified to the SJC at this time.

### IV. *CONCLUSION*

For all of the reasons detailed above, this court recommends to the District Judge to whom this case is assigned that the Omnicare Parties' Motion for Summary Judgment (Docket No. 107) be DE-

---

12. Pursuant to SJC Rule 1.03, the SJC may answer questions of law certified to it by a United States District Court "if there are involved in any proceeding before it questions of law of this state which may be determinative of the cause then pending in the certifying court and as to which it appears to the

NIED.[13]

March 9, 2007.

certifying court there is no controlling precedent in the decisions of this court."

**13.** The parties are hereby advised that under the provisions of Fed.R.Civ.P. 72 any party who objects to these proposed findings and recommendations must file a written objection thereto with the Clerk of this Court within 10 days of the party's receipt of this Report and Recommendation. The written objections must specifically identify the portion of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The parties are further advised that the United States Court of Appeals for this Circuit has repeatedly indicated that failure to comply with this Rule shall preclude further appellate review. *See Keating v. Sec'y of Health & Human Servs.,* 848 F.2d 271, 275 (1st Cir.1988); *United States v. Valencia–Copete,* 792 F.2d 4, 6 (1st Cir.1986); *Park Motor Mart, Inc. v. Ford Motor Co.,* 616 F.2d 603, 604–605 (1st Cir.1980); *United States v. Vega,* 678 F.2d 376, 378–79 (1st Cir.1982); *Scott v. Schweiker,* 702 F.2d 13, 14 (1st Cir.1983); *see also Thomas v. Arn,* 474 U.S. 140, 153–54, 106 S.Ct. 466, 474, 88 L.Ed.2d 435 (1985). *Accord Phinney v. Wentworth Douglas Hosp.,* 199 F.3d 1, 3–4 (1st Cir.1999); *Henley Drilling Co. v. McGee,* 36 F.3d 143, 150–51 (1st Cir.1994); *Santiago v. Canon U.S.A., Inc.,* 138 F.3d 1, 4 (1st Cir. 1998).